**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA,                          :
ex rel. Jon J. Platz,                              :
                                                   :
                              Relator,             :
                                                   :           OPINION AND ORDER
              -against-                            :           12-cv-08399 (GBD)
                                                   :
                                                   :
BANK OF AMERICA CORPORATION,                       :
                                                   :
                              Defendant.           :
                                                   :
                                                   :
                                                   :
                                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

GEORGE B. DANIELS, United States District Judge:

   *Qui tam* relator Jon J. Platz brings this action on behalf of the United States of America

against Bank of America Corporation ("BofA") under the False Claims Act, 31 U.S.C. § 3729, *et*

*seq.*[1]  (Third Amended Complaint ("TAC"), (ECF No. 51), at ¶¶ 114-38.)  Platz primarily alleges

that BofA defrauded the Federal National Mortgage Association ("Fannie Mae") and Federal

Home Loan Mortgage Corporation ("Freddie Mac") (collectively, "GSEs") by falsely certifying

that refinanced mortgages it sold to the GSEs complied with eligibility requirements set forth by

the GSEs.  Platz also alleges that BofA illegally retaliated against him for pursuing these FCA

claims by constructively discharging him from his position at BofA.[2]  BofA moved to dismiss the

---

[1] The False Claims Act permits a private citizen, known as a "relator," with personal knowledge of a fraud against the Government to file suit, known as a *qui tam* action, on behalf of the Government.  31 U.S.C. § 3730(b).  The relator must serve a copy of the complaint on the Government.  *Id.*  The Government then typically has 60 days to decide whether to intervene and proceed with the action itself.  *Id.*  If it declines, the relator may proceed with the action in exchange for a larger share of the damages if the suit prevails.  31 U.S.C. § 3730(d).  The complaint typically remains under seal, and will not be served upon the defendant, until the Government has decided whether it will intervene.  31 U.S.C. § 3730(b).

[2] Platz also had alleged that BofA made reverse false claims, in violation of 31 U.S.C. § 3729(a)(1)(G), (TAC at ¶¶ 125-31), but he voluntary dismissed this cause of action without prejudice, (*see* Notice of

TAC pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.  BofA's motion is granted.

## I.   Background

Fannie Mae and Freddie Mac were originally chartered by Congress in 1968 and 1970, respectively, to support the American housing market through the development of secondary mortgage markets. *See* Housing and Urban Development Act of 1968, Pub. L. No. 90-448, Title VII (Aug. 1, 1968) (establishment of Fannie Mae), codified at 12 U.S.C. § 1716b; Emergency Home Finance Act of 1970, Pub. L. No. 91-351, Titles II and III (July 24, 1970) (establishment of Freddie Mac), codified at 12 U.S.C. § 1451 *et seq.*  They purchase mortgage loans from lenders, like BofA, primarily to sell to investors in the secondary market as mortgage-backed securities ("MBSs").  (TAC at ¶ 16.)

As is now well-known, in late 2006, the United States economy suffered a major setback when the housing market collapsed.  (*Id.* at ¶ 17.)  The collapse's impact on the GSEs was severe. Due to borrower defaults, the GSEs suffered large losses.  (*See id.* at ¶ 27.)  As a result, the GSEs were rendered insolvent.  (*Id.* at 17.)

In an effort to limit the impact of the GSEs' struggles on the rest of the economy, Congress passed the Housing and Economic Recovery Act of 2008, which created the Federal Housing Finance Agency ("FHFA").  (*Id.*).  Shortly thereafter, the FHFA designed a mechanism to help stabilize the housing market, and therefore the GSEs: the Home Affordable Refinance Program ("HARP").  (*See id.* at ¶ 37.)  The aim was to create a program in which troubled borrowers with high loan-to-value ("LTV") mortgages—*i.e.*, those with little, no, or even negative equity in their

---

Voluntary Dismissal of Third Claim for Relief Pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i), (ECF No. 66), at 1-2).

homes—would be able to refinance at the lower interest rates set by the Federal Reserve as part of its "quantitative easing" strategy. (*Id.* at ¶ 27-28; *see also id.* at ¶ 72.) The FHFA reasoned that if borrowers could refinance their GSE-owned mortgages at lower interest rates and decrease their monthly payments, they would be less likely to default on their mortgages, and they could stay in their homes. (*Id.* at ¶¶ 27, 37.) Under HARP, the GSEs offered to purchase from the refinancing lender mortgages of homeowners with LTV ratios of up to 125%. (*See id.* at ¶¶ 29, 31.)

Although HARP eliminated the need for borrowers to purchase private mortgage insurance, transaction costs associated with refinancing remained high. (*Id.* at ¶ 29.) A major reason was due to the fact that the GSEs required lenders to assess loan level price adjustment fees ("LLPAs") on borrowers with low credit scores or high LTV ratios—the very borrower that HARP was designed to help—to protect the GSEs from the enhanced risk of default and foreclosure presented by such borrowers. (*Id.*) The GSEs collected the LLPAs by deducting the LLPA amount from the price they would pay the lender for the mortgage at the time of purchase. (*Id.*)

To encourage more borrowers to participate in HARP, the FHFA revised the program in October 2011 ("HARP 2.0") by reducing or eliminating the LLPAs, depending upon the type of loan. (*Id.* at ¶¶ 32-34.) Additionally, it eliminated the 125% loan-to-value ratio participation cap, so that even more troubled borrowers could participate in the program. (*Id.*) Additionally, the GSEs sought to overcome lender reluctance by loosening some of the stringent restrictions they previously imposed upon their lenders. (*Id.* at ¶ 36.) For instance, HARP 2.0 relaxed many borrower income verification requirements and eliminated the requirement that lenders obtain a manual appraisal in most cases. (*Id.*) In a further modification occurring in late 2012, FHFA and the GSEs also provided substantial relief as to certain representation and warranties, reducing lender liability exposure for problems with the original loan underwriting. (*Id.*) These

3

modifications reduced the costs associated with refinancing HARP loans because they eliminated work and reduced the lender's risk. (*See id.*; *id.* at ¶ 91-92 (stating expenses associated with refinancing HARP 2.0 loans were "substantially less" than those associated with refinancing non-HARP and other types of loans).)

To help protect HARP borrowers from a lack of competition, and to limit the transaction costs associated with refinancing so that the program would work, the GSEs capped the amount lenders could charge borrowers in "points and fees" to 5% of the mortgage amount. (*Id.* at ¶ 55; *see id.* at ¶¶ 48-49 (citing Fannie Mae 2012 Selling Guide, Section A3-2-02, B2-1.4-03 (attached in Declaration of Andrea Fischer in Opposition to Defendant's Motion to Dismiss the Third Amended Complaint ("Fischer Decl."), Exhibit 1 Part 1, (ECF No. 58-1), at 8; Fischer Decl., Exhibit 1 Part 2, (ECF No. 58-2), at 11))); (*see id.* (citing Freddie Mac Seller/Servicer Guide, Section 22.32 (attached in Fischer Decl., Exhibit 2, (ECF No. 58-3), at 4)).[3]) The GSEs also prohibited lenders from steering uninformed borrowers to higher cost loan products when they qualified for other, lower-cost products. (*Id.* at ¶¶ 70-71; *see* Fannie Mae 2012 Selling Guide, Section A3-2-02; Freddie Mac Seller/Service Guide, Section 22.32 (stating that lenders could not direct borrowers to a "higher-priced subprime or non-prime lending channel" when the seller qualified for a "standard" loan product).) This provision, in effect, prohibited lenders from taking advantage of uninformed borrowers that had relatively decent credit and income-related characteristics by selling these borrowers more expensive loan products than those for which they were otherwise eligible. Lenders had to annually certify to the GSEs that they complied with these requirements, and such certification was also a standard provision in each loan purchase contract

---

[3] Fannie Mae's Selling Guide and Freddie Mac's Seller/Servicer Guide were incorporated into the TAC by reference. Going forward, these documents are cited directly and collectively referred to as "Selling Guides."

that the GSEs executed with the lenders, meaning compliance was a condition of payment. (*Id.* at ¶ 34; *see also id.* at ¶¶ 46-47.)

Although there were a lot of requirements with which lenders had to comply to participate in HARP, there were also benefits. For instance, the GSEs paid lenders premiums for mortgages that carry an interest rate exceeding a "par" rate set by the GSEs each day. (*Id.* at ¶¶ 51, 57, 60.) The premium corresponds to the degree to which the mortgage's interest rate exceeds the "par" rate.[4] (*Id.* at ¶¶ 57, 60.) Because a borrower's interest rate is determined based upon the credit and income-related characteristics of the borrower and the condition of the mortgage, lenders were able to earn significant premiums by refinancing these mortgages for the "troubled" HARP borrower.[5] (*See id.* at ¶ 65 (indicating that borrower's credit history and financial information impacted interest rate borrower was eligible for, and that HARP borrowers were offered higher interest rates than non-HARP borrowers); *see also* ¶ 69.) And, again, the deal got better for lenders under HARP 2.0 when the GSEs reduced the work and liability associated with refinancing these loans. (*Id.* at ¶ 45 (discussing reduced lender work and liability under HARP 2.0); *id.* at ¶ 85 (discussing higher profitability under HARP 2.0).) Thus, lenders earned especially high profits refinancing mortgages under HARP 2.0.[6] (*See id.* at ¶¶ 92-93.)

BofA was one of the lenders that refinanced mortgages under both versions of HARP. When refinancing a mortgage, BofA presented multiple offers to the borrower. (*See id.* at ¶¶ 70-

---

[4] Likewise, the GSEs charge lenders points when purchasing mortgages carrying interesting rates below the "par" rate. (*Id.* at ¶¶ 57, 60.)

[5] Because lenders sold the mortgages to the GSEs, the GSEs' received the benefit of interest rates reflecting the relative risk of default.

[6] *See e.g.*, Khimm, *How banks win big from Obama's new refinancing program*, Wash. Post, Mar. 23, 2012 (stating lenders were "earning massive profits on originations"); Collins, *Megabanks Seem to be Raking in the Profits on HARP 2.0*, National Mortgage News, Mar. 26, 2012 (stating "Wells Fargo, JP Morgan Chase and Bank of America . . . [are] earning massive profits on [HARP 2.0] originations").

71.)  These offers consisted of both up-front fees, such as origination fees, underwriting fees, and broker's fees (which could not exceed 5% of the loan's value), as well as an interest rate.  (*See id.* at ¶¶ 49-50, 70-71.)  An inverse relationship existed between the up-front fees and interest rates associated with each offer—*i.e.*, the lower the mortgage offer's up-front fee, the higher its interest rate, and vice versa.  (*Id.* at ¶¶ 58, 60-61, 64-65.)  BofA did not sacrifice revenue by accepting a lower up-front fee because the interest rate associated with the lower fee increased by the amount necessary to generate a corresponding increase in the premium BofA would receive from the GSE when BofA sold the refinanced mortgage containing the above-par interest rate to the GSE.  (*See id.* at ¶¶ 58, 60-61, 64-65.)  Similarly, BofA did not earn more revenue if the borrower happened to select an offer with higher up-front fees because it would earn fewer "premium" points (or even be charged) when it sold the loan to the GSEs due to the correspondingly lower interest rate associated with the offer.  (*See id.* at ¶¶ 58, 60-61, 64-65.)

The relator, Jon J. Platz, was employed by BofA as a loan officer until he quit his job in the summer of 2013.  (*Id.* at ¶¶ 6, 113.)  Specifically, Platz worked in retail sales originating loans to help clients finance the purchase of their homes.  (*Id.* at ¶ 6.)  The TAC alleges that Platz became frustrated with BofA's HARP lending practices because BofA was earning higher profit margins on HARP loans than on other products, and he believed that earning such profits was inconsistent with HARP's purpose to help struggling borrowers.  (*Id.* at ¶¶ 104, 107-08.)  He also was frustrated with the high fees and interest rates that HARP customers were subject to.  (*Id.* at ¶¶ 105-108.)  Platz made several comments to his superiors expressing his displeasure.  (*Id.* at ¶¶ 104, 107-08.)  In response, Platz alleges that his superior treated him "coldly," and told him that he might have to take away his assistant (who happened to be his wife).  (*Id.* at ¶ 110.)  Platz was also denied a performance bonus for 2012.  (*Id.* at 111.)  Shortly thereafter, he quit.  (*Id.* at ¶ 113.)

## II.      The False Claims Act

Platz asserts False Claims Act violations under Sections 3729(a)(1)(A) and (a)(1)(B) of Title 31 of the United States Code.  Subsection (a)(1)(A) imposes liability upon any person who "knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).  A "claim" is defined as "any request or demand . . . for money or property" that has been made either to (i) "an officer, employee, or agent of the United States"; or (ii) "a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest."  *Id.* § 3729(b)(2)(A)(i)-(ii).  If the request or demand is made to "a contractor, grantee, or other recipient," the relator must also prove that the Government provides, has provided, or will reimburse "any portion of the money or property requested or demanded."[7]  *Id.* § 3729(b)(2)(A)(ii)(I)-(II).  To prove a cause of action under this subsection, then, the relator must show that: "(1) there was a false or fraudulent claim, (2) the defendant knew it was false or fraudulent, (3) the defendant presented the claim, or caused it to be presented to the United States, and (4) it did so to seek payment from the federal treasury."    *U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 252 (S.D.N.Y. 2014) (citing *U.S. ex rel. Mikes v. Straus*, 274 F.3d 687, 695 (2d Cir. 2001)).

It is well-recognized that "the submission of a false claim is the '*sine qua non* of a False Claims Act violation.'"  *Id.* at 253 (quoting *U.S. ex rel. Clausen v. Laboratory Corp. of Am., Inc.*,

---

[7] BofA argues that Platz's claims should be dismissed because it only alleges that claims were submitted to the GSEs, which are not government agencies, and because Platz has not pleaded facts showing that the Treasury's investment in the GSEs was used to purchase the HARP 2.0 loans at issue.  (BofA Memo at 8-9.)  Although the Government declined to intervene in this action, it filed a Statement of Interest urging this Court to reject these arguments.  (Statement of Interest of the United States Regarding Defendant's Motion to Dismiss the Third Amended Complaint, (ECF No. 71).)  Because this Court has determined that the TAC is dismissed on other grounds, it declines to opine on whether the TAC has sufficiently pleaded facts related to this FCA-claim element.

290 F.3d 1311 (11th Cir. 2002)).   A "claim" may be deemed "false" by virtue of being "factually false" or "legally false."  "Factually false" claims are those of the type that include "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided."  *Mikes*, 274 F.3d at 697.  "Legally false" claims may be expressly or implicitly false.  *Express* legal falsity describes the situation where a defendant "falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment."  *Id.* at 698; *see U.S. ex rel. Collucci v. Beth Israel Med. Ctr.*, 785 F. Supp. 2d 303, 314-15 (S.D.N.Y. 2011) (general argument will not suffice to establish FCA liability "[i]n the absence of any statute or regulation prohibiting" challenged conduct); *U.S. ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 445 (3d Cir. 2004) (no FCA liability in "the absence of a clear obligation").  *Implied* legal falsity is "based on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment."  *Id.*

### III.    Standard of Review

To survive a Rule 12(b)(6) motion to dismiss, the "complaint must contain sufficient factual matter . . . to 'state a claim for relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  This standard has been met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  However, when the facts pleaded leave the Court speculating as to whether the defendant is liable for the misconduct alleged, the plaintiff has failed to carry this burden.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citing *Twombly*, 550 U.S. at 555)).

8

Although under Rule 8 a party need only submit "a short and plain statement of the claim showing that the pleader is entitled to relief, Fed. R. Civ. P. 8(a)(2), when a plaintiff alleges fraud, Rule 9(b) requires the pleading party to satisfy a stricter standard. Because the False Claims Act is an anti-fraud statute, "claims brought under the FCA fall within the express scope of Rule 9(b)." *Gold v. Morrison–Knudsen Co.*, 68 F.3d 1475, 1477 (2d Cir.1995) (per curiam). Thus, when alleging FCA violations, a "party must [also] state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b). "[C]onclusory allegations or legal conclusions masquerading as factual conclusions" will not suffice. *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (citation omitted). Ensuring that a plaintiff's complaint has satisfied Rule 9(b)'s heightened pleading standard serves several purposes, including the "safeguard[ing] [of] a defendant's reputation from improvident charges of wrongdoing," *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (citation omitted), and "discourage[ing] the filing of complaints as a pretext for discovery of unknown wrongs." *Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989) (citation omitted).

## IV.    Failure to Plead a False Claim

The TAC has failed to adequately plead that BofA falsely certified compliance with the GSEs' requirements each time it sold a loan to the GSEs because he has failed to plead facts supporting a reasonable inference that BofA was not in compliance with the requirements.

### A.   The TAC Does Not Plausibly Allege that BofA Violated the 5% Cap Provision

As a condition of selling loans to the GSEs, lenders must certify that they did not charge borrowers more than 5% of the loan's value in "points and fees." Specifically, Fannie Mae's provision provides:

> Fannie Mae will not purchase or securitize mortgages if the total points and fees charged to the borrower exceeds the greater of 5%

of the mortgage amount or $1,000 regardless of the party paying the
fee.

- Points and fees counted against this limitation include:
    - origination fees,
    - underwriting fees,
    - broker fees,
    - finder's fees,
    - charges imposed by lenders as a condition of making
      the loan whether they are paid to the lender or a third
      party.

Fannie Mae 2012 Selling Guide, Section B2-1.4-03.[8]

The TAC alleges that when BofA refinanced a mortgage at an interest rate exceeding
"par"—*i.e.*, "the rate at which no points are either paid or earned in the secondary market"—the
GSE purchasing the mortgage would pay BofA an additional, predetermined amount
corresponding to the degree to which the rate exceeded par (*i.e.*, "back-end" or "premium" points).
(TAC at ¶¶ 59, 61.) Platz argues that these premium points were financed by borrowers each time
they made their monthly above-par interest rate loan payment, and thus, constitute "charges"
imposed on them within the meaning of the 5% cap provision. (*Id.* at ¶¶ 50, 56.) Thus, Platz
argues further that BofA violated the GSEs' 5% cap provision whenever the sum of the up-front
points and fees that BofA charged borrowers at or before the time of closing and the back-end
points exceeded 5% of the loan's value. (*Id.* at ¶ 47.) The TAC alleges that BofA falsely certified
compliance with this condition each time it submitted one of these loans for sale to the GSEs
because compliance with the 5% cap was a precondition for payment.

The parties dispute whether the additional "back-end" points that the GSEs paid BofA are
included within the types of "points and fees" that are subject to the 5% cap. The "above-par"

---

[8] Freddie Mac sets forth a provision that is identical in all material respects. *See* Freddie Mac Seller/Servicer
Guide, Section 22.32.

portion of the interest rate paid by borrowers to the GSEs are not "origination fees, underwriting fees, broker fees, or finder's fees." The question is whether the "above-par" portion of the interest rate payments paid by borrowers are properly considered "charges imposed by lenders as a condition of making the loan whether they are paid to the lender or a third party." The answer is no.[9]

First, the phrase "as a condition of making the loan" expressly limits the charges captured by the clause to payments made at or before closing. Once the loan closes, it is no longer a conditional contract. At this point, both the lender's and borrower's performance obligations have been triggered. The interest that the borrower must pay, both the par and "above-par" portions, are *performance obligations* under the loan, not conditions to making the loan.

Second, applying the well-established interpretive principle *ejusdem generis* also leads to this result. The canon provides that "where general words follow an enumeration of specific terms, the general words are read as applying only to other items akin to those specifically enumerated." *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588 (1980) (applying principle to interpretation of statute); *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, 445 F. Supp. 2d 320, 352-53 (S.D.N.Y. 2006) (applying *ejusdem generis* to contracts); *In re Enron Creditors Recovery Corp.*, 380 B.R. 307, 323 (S.D.N.Y. 2008) (stating *ejusdem generis* "is employed to limit 'broad catch-all terms' in a manner consistent with other listed terms that are more specific"). Each of the specifically enumerated "points and fees" immediately before the clause at issue are all one-time discrete charges imposed by the lender at or before closing. Thus, these fees are distinguishable

---

[9] When the meaning of a contractual or regulatory provision underlying a false certification claim is disputed, that dispute presents a question of law. *See Mikes*, 274 F.3d at 699 (2d Cir. 2001) (rejecting false certification claim alleging non-compliance with terms in Medicare form after concluding as a matter of law that claim rested on misinterpretation of term "medical necessity"); *United States v. DRC, Inc.*, 856 F. Supp. 2d 159, 167-68 (D.D.C. 2012) (for purposes of false certification claim, "[i]nterpreting the plain language of a contract is a question of law, not a question of fact").

from the "above-par" portion of the interest rate, which is paid in installments over the life of the loan.

Finally, Platz alleges that all of the premium points that the GSEs pay for loans with interest rates above the "par" rate are subject to the 5% cap.  Claiming that the above-par portion of the interest rate is another charge imposed on borrowers as a condition of making the loan—as opposed to a legitimate portion of the interest rate that is not subject to the cap—presupposes that all borrowers were eligible to receive the "par" interest rate regardless of their credit characteristics.  The TAC, however, acknowledges that the interest rate borrowers are eligible to receive vary based on credit characteristics. (*See* TAC at ¶ 65 (acknowledging that "credit history" and "financial information" are relevant to determining applicable interest rate, and not suggesting that every borrower is entitled to the same interest rate regardless of these factors).)  Furthermore, the Selling Guides themselves acknowledge that the interest rate to which a borrower is entitled appropriately depends on "the credit characteristics of the mortgage."  *See* Fannie Mae 2012 Selling Guide, Section B2-1.4-03 (stating that up-front points charged in exchange for a lower interest rate do not count towards the 5% cap so long as the initial interest rate was "consistent with current market rates *based on the credit characteristics of the mortgage*," not necessarily the "par" rate (emphasis added)).  In other words, not every borrower is entitled to the "par" interest rate.  Thus, the TAC has failed to plausibly allege that the back-end points that GSEs paid lenders when purchasing "above-par" loans were "charged" to borrowers since there is no indication that borrowers paid any more than they otherwise would have had the GSEs not paid premium points on the back end.  Accordingly, the TAC has failed to allege that BofA falsely certified compliance with this requirement when selling loans to the GSEs.

**B. The TAC has Failed to Plead a Violation of the Anti-Steering Provision**

The TAC also alleges that BofA falsely certified that loans it had submitted for sale to the GSEs complied with the GSEs' prohibition against steering borrowers to higher-cost loan products.  Specifically, the TAC alleges that BofA used "high up-front points to steer borrowers into selecting financing options" with "above-market rates that had the undisclosed points baked into the interest rate on the back-end."  (TAC at ¶¶ 70-71.)  The TAC alleges that each HARP 2.0 loan sale constituted a false claim due to the GSEs' requirement that lenders certify compliance with the GSEs' Selling Guides as a condition for selling loans to the GSEs.

Fannie Mae's anti-steering policy reads as follows:

> A borrower should be offered the lowest-cost product with the lowest-risk loan terms for which the borrower qualifies.  A borrower should be placed in a higher-cost product designed for persons with impaired credit only when an objective review of the borrower's credit- and income-related criteria supports placing the borrower in such a product.  Lenders must not steer borrowers toward a low- or no-income documentation program to qualify the borrower for a mortgage loan in an effort to misrepresent the borrower's true credit and/or income related qualifications.

Fannie Mae 2012 Selling Guide, Section A3-2-02.[10]

The TAC does not allege any facts to support the inference that BofA's offers containing lower up-front fees and higher back-end interest rates were more expensive than its offers containing higher up-front fees and lower back-end interest rates, a necessary element to prove an anti-steering provision violation.  In fact, it alleges just the opposite: that borrowers incurred the same cost to refinance regardless of which option they selected.  (*Id.* at ¶¶ 56-61 (stating that BofA's gross profit margins were akin to the costs imposed on the borrower, and that BofA earned the same gross profit margin regardless of which option the borrower selected).)

---

[10] Freddie Mac sets forth a provision that is identical in all material respects.  *See* Freddie Mac Seller/Servicer Guide, Section 22.32.

Furthermore, to succeed on this theory, the TAC had to allege facts leading to the reasonable inference that HARP 2.0 borrowers were eligible for more affordable loan products. The TAC alleged just the opposite: that HARP borrowers were *not* eligible for other, less-expensive loan products. (*Id.* at ¶ 94 ("[B]orrowers who utilized the HARP 2.0 program could not qualify for traditional refinance programs because they had little to no equity (or even negative equity) in their homes."); *see id.* at ¶ 29 (indicating that HARP borrowers had low credit scores, high loan-to-value mortgages, or both, undercutting the notion that they were eligible for other loan products with more favorable terms); *cf. id.* at ¶ 28 (explaining that HARP borrowers had no other access to refinancing aside from HARP).)  Although Platz contends that BofA "steered" HARP 2.0 borrowers towards loans with above-market interest rates, loans with above-market interest rates were the only types of loans for which these borrowers were eligible.

Allowing borrowers to choose whether to make portions of their refinanced loan payments up-front or in monthly installments did not violate the GSEs' anti-steering provision both because the TAC has not alleged facts supporting a reasonable inference that (1) borrowers incurred higher costs by selecting one method as opposed to another, or that (2) HARP 2.0 borrowers were eligible for offers with more favorable terms.  Thus, the TAC has failed to allege that BofA failed to comply with the anti-steering requirement, and consequently, that it falsely certified compliance when it submitted loans for sale to the GSEs.

## C. The TAC Does Not Plausibly Allege that BofA Submitted False Claims By Replacing The LLPAs

Next, the TAC alleges that BofA failed to meet an independent legal obligation and likewise broke a promise it had made to pass along the GSEs' LLPA reductions to HARP 2.0 borrowers. (*Id.* at ¶¶ 38-44, 80.)  The TAC alleges that HARP 2.0 borrowers paid more to refinance than they otherwise would have had BofA complied with its obligation and kept its promise to not

14

replace with its own fees or "overlays" the LLPAs that the GSEs had reduced or eliminated. (*Id.* at ¶ 82 (stating that BofA "replaced the withdrawn LLPAs with its own 'overlay' points and fees . . . . cancel[ing] out any savings that should have accrued to borrowers when the GSEs removed/reduced their LLPAs").) The TAC alleges that the higher gross profit margins that BofA earned on HARP 2.0 mortgages compared to HARP 1.0 mortgages, and relatively higher interest rates on HARP 2.0 mortgages as compared to the non-HARP national average, which were due to customers choosing to roll the extra fees into their interest rate rather than pay them up front, demonstrate that BofA replaced the LLPAs with its own fees. (*See generally id.* at ¶¶ 80-100.) BofA therefore is accused of submitting false claims when it sold the GSEs refinanced loans containing these overlays.

To establish that the GSEs' prohibited such conduct, the TAC sets forth two announcements, one made by each GSE,[11] since the Selling Guides themselves did not prohibit such conduct.[12]   (*See id.* at ¶¶ 33-34.)  In the announcements, the GSEs stated that, with the implementation of HARP 2.0, they were eliminating LLPAs on mortgages with an amortization less than or equal to 20 years, and substantially reducing them on mortgages with an amortization greater than 20 years. *See* Freddie Mac Bulletin No. 2011-22 (Nov. 15, 2011); Fannie Mae Selling Guide Announcement SEL 2011-12 (Nov. 15, 2011).

These provisions, however, simply announced the elimination or reduction of LLPAs by the *GSEs*.  The provisions did not impose any obligation on *lenders* to take or refrain from taking any particular action.  Fannie Mae 2012 Selling Guide, Section B2-1.4-03.  Because Platz points

---

[11] *See supra* note 9.

[12] The Selling Guides required lenders to comply not only with the requirements set forth therein, but also with requirements they set forth in other documents. *See* Freddie Mac Seller/Servicer Guide Section 4.2; Fannie Mae 2012 Selling Guide, Section A2-1-01.

to no specific provision that the *lenders* were required to take or refrain from taking to support his claim that they were prohibited from "replacing" the GSEs' LLPAs, this claim fails as a matter of law. *See Mikes*, 274 F.3d at 698; *Collucci* 785 F. Supp. 2d at 314-15; *Quinn v. Omnicare Inc.*, 382 F.3d at 445.

Platz also alleges that even if the GSEs did not impose such a prohibition, BofA bound itself to not replace the LLPAs with its own fees when it made promises not to do so. Subsection (a)(1)(B) imposes liability upon any person who "knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). To prove a claim under this subsection, the relator must show that: (1) the defendant made (or caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false claim." *Kester*, 23 F. Supp. 3d at 252. Furthermore, "[t]o satisfy the pleading requirements of Rule 9(b), a complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Wood ex rel. U.S. v. Applied Research Associates, Inc.*, 328 F. App'x 744, 747 (2d Cir. 2009) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

Additionally, when an allegation under subsection (a)(1)(B) is grounded not in a false certification theory, but is based instead on a theory that the defendant's statement induced the government to pay a claim that it would not have paid had it known the truth, the plaintiff must also plead facts demonstrating that the government relied on the statement to state a claim for relief. *See Mikes*, 274 F.3d at 696 (incorporating the common law elements of fraud into this theory of FCA liability); *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 623-24 (S.D.N.Y. 2013) (describing fraudulent inducement theory of FCA liability, and demonstrating

that the government must rely on the misrepresentation to have been defrauded under this theory); *U.S. ex rel. Thomas v. Siemens AG*, 991 F. Supp. 2d 540, 569 (E.D. Pa.) ("To prevail under [a] fraudulent inducement theory," a relator "must prove . . . the government was induced by, or relied on, the fraudulent statement . . . ." (emphasis omitted)), *aff'd*, 593 F. App'x 139 (3d Cir. 2014).

Platz provides several statements to support his allegation that BofA promised not to replace the reduced or eliminated LLPAs with its own overlays. None are sufficient to sustain a cause of action under § 3729(a)(1)(B).

First, he quotes statements made by *FHFA officials* that "lenders . . . agreed to remove their own restrictions and overlays" in HARP 2.0, (TAC at ¶¶ 40-41), and that FHFA was working with lenders "collaboratively to remove the hurdles that [FHFA] considered to be the most prohibitive to borrower participation," (*id.* at ¶ 42.) These statements were not made by BofA officials, nor do they even identify BofA, let alone constitute a promise by BofA to the FHFA about actions that BofA would take with respect to pricing under HARP 2.0. Platz's attempt to attribute these general and purportedly false statements to BofA are insufficient to state a claim for relief. *See Morgan ex rel. U.S. v. Sci. Applications Int'l Corp.*, 2008 WL 2566747, at *5 (S.D.N.Y. June 26, 2008) ("[P]laintiffs' general attribution, to the defendants, of the purported false statements published in the . . . report is untenable to support a particularized pleading of fraud [because the] [d]efendants are not the authors of the report.").

Second, Platz quotes a BofA press release stating that BofA "affirms its strong support" for HARP and has "begun offering improved pricing for eligible customers, a key tenet of the enhancements." (TAC at ¶ 43.) Again, the statement does not reflect a promise to take or refrain from taking any action, and therefore this statement fails to support Platz's theory. Furthermore,

the statement is not even objectively false since the TAC indicates that HARP 2.0 borrowers, on average, received a more favorable interest rate than 1.0 borrowers.  (TAC at ¶ 88.)

Third, Platz cites an internal BofA document stating that BofA had begun implementing HARP 2.0 "with a new pricing structure that lowers the up-front costs for many HARP borrowers," and that "[t]he new guidelines for HARP provide for reduced fees . . . ." (*Id.* at ¶ 44 (emphasis omitted).)  The TAC does not allege that the GSEs were even aware of this document, and therefore it is insufficient to serve as a basis for liability since the GSEs could not have relied upon statements contained within it when deciding whether to purchase HARP 2.0 loans from BofA.

Moreover, as the Supreme Court has noted, "[d]etermining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  The context here belies the allegation that any statements made by BofA would have been material to the GSEs' decision whether to purchase a particular loan that had been refinanced under HARP 2.0.  31 U.S.C. § 3729(a)(1)(B) (requiring false statement to be "material" to payment of false claim); *Kester*, 23 F. Supp. 3d at 252 (same).

The TAC alleges that lenders were required to comply with the Selling Guides regulating the HARP 2.0 program, which the GSEs periodically updated unilaterally.  (TAC at ¶ 39.)  Nevertheless, it asserts that "FHFA took additional steps to ensure that [the lenders] did not attempt to replace the LLPA reduction with fees of their own.  To that end, FHFA . . . [met] with BofA and the other major banks before the HARP 2.0 rollout to obtain their commitment to pass on to borrowers the benefit of FHFA's elimination/reductions in fees, and not just add their own 'overlays.'"  It is simply not plausible that the GSEs would not have memorialized any assurances allegedly provided if such assurances were material to the GSEs' decision of whether to purchase

a loan submitted to it. The only plausible inference is that if the lenders acted in accordance with the terms of the Selling Guides, which as relevant to this issue, remained unchanged, the GSEs would purchase the refinanced loan.

Finally, even if Platz had demonstrated that the GSEs had imposed such a prohibition or BofA made such a promise not to replace the LLPAs, the TAC does not set forth sufficient facts to plausibly show that BofA actually replaced the LLPAs that the GSEs had reduced or eliminated with its own fees when it refinanced loans under HARP 2.0 with its own fees, and therefore has failed to show that BofA actually submitted non-compliant loans to the GSEs for sale. This also provides an independent basis to dismiss this claim.

The TAC alleges that the increased profit margins and relatively higher interest rates as compared to the national average under HARP 2.0 demonstrate that BofA replaced the LLPAs with its own fees. This allegation, however, presupposes that the borrowers refinancing under HARP 1.0 and 2.0 presented a similar risk of default. If not, and the HARP 2.0 borrowers presented a greater risk of default, the relatively higher interest rates and gross profit margins could be attributed to that difference, since these borrowers would justifiably be subject to higher interest rates, generating additional "back-end" points for BofA when it sold these mortgages to the GSEs. Indeed, the TAC suggests that HARP 2.0 borrowers presented a greater risk of default than those who refinanced under HARP 1.0

The TAC indicates that borrower-specific factors, such as credit history and LTV ratio, determined the amount of the LLPAs that would be assessed on behalf of the GSEs under version 1.0. (*See id.* at ¶ 29 (stating that LLPAs were assessed only on borrowers with "low credit scores and/or high loan to value ratios"); *id.* at ¶¶ 72, 88 (stating that under HARP 1.0, LLPAs *up to* 2.5% of loan value could be imposed, suggesting that LLPAs were not fixed, but determined on a case-

by-case basis).)  The TAC also alleges that under HARP 1.0, many otherwise eligible borrowers declined to refinance because their credit history or LTV ratio, or both, subjected them to LLPAs which made refinancing financially impractical.  (*Id.* at ¶ 29 ("[M]any borrowers who otherwise would have qualified for the HARP 1.0 program chose not to participate because the LLPA consumed any savings they might have achieved by refinancing.").)  Other borrowers with LTV ratios of 125% and higher were flat-out prohibited from refinancing under HARP 1.0, but then became eligible to refinance when HARP 2.0 eliminated that prohibition.  (*Id.* at ¶ 33.)  A reasonable inference, then, is that, on average, HARP 2.0 borrowers' risk profiles were less favorable than the profiles of borrowers who had refinanced under version 1.0.

Under both versions of HARP, BofA was authorized to set an interest rate commensurate with the borrower's credit history and LTV ratio.  *See e.g.*, Fannie Mae 2012 Selling Guide, Section B2-1.4-03 (indicating that baseline interest rate determined by "credit characteristics of the mortgage"); (*cf.* TAC at ¶ 65 (indicating that BofA would not have violated any provision by generating interest rate offers based solely on borrower characteristics)).  The amount of premium points that the GSEs paid to BofA for loans carrying interest rates above par corresponded to the degree to which the rate exceeded par, and therefore, to the degree to which the borrower's underlying characteristics exhibited correspondingly greater risk.  (*Id.* at ¶¶ 57, 60.)  Additionally, under both versions of HARP, the Selling Guides expressly permitted lenders to charge their own credit-risk adjustment fees, and these fees did not apply to the 5% fee cap.  Fannie Mae 2012 Selling Guide, Section B2-1.4-03; *see also* FHFA News Release, *FHFA Fannie Mae and Freddie Mac Announce HARP Changes to Reach More Borrowers*, Oct. 24, 2011; TAC at ¶ 33.  Moreover, the TAC states that there was a significant decrease in the costs associated with refinancing loans under HARP 2.0 as compared to under HARP 1.0.  (*See* TAC at ¶ 37 (stating that the insulation

that HARP 2.0 from underwriting liability by "relax[ing] many borrower income verification requirements and eliminate[ing] the requirements that lenders obtain a manual appraisal in most cases," were "large benefits . . . because they eliminate work for banks and also decrease the bank's risk in underwriting the loan"); *id.* at ¶ 91 ("HARP 2.0 loans involved limited expense for BofA compared to purchase loans or even non-HARP refinance loans because BofA generally did not have to perform many of the tasks that it normally would for purchase or refinance loans, such as reviewing appraisals and verifying the income, assets, and credit of borrowers."); *id.* at ¶ 92 ("HARP 2.0 loans had substantially less administrative expenses and risks).)[13]

The facts alleged in the TAC, then, plausibly suggest BofA earned enhanced gross profit margins on HARP 2.0 loan refinancings because the borrowers' credit characteristics yielded additional fees and premium points (because the interest rates they received on average, although lower in an absolute sense, were higher relative to par), and because costs associated with HARP 2.0 decreased. Although these facts cannot entirely erase the *possibility* that BofA's increased gross profit margins might have been due to replacing LLPAs with its own overlays, the mere possibility of misconduct is not enough to survive a 12(b)(6) motion to dismiss, and certainly not enough to satisfy Rule 9(b)'s heightened pleading standard. *Iqbal*, 556 U.S. at 679 (stating to survive a motion to dismiss, "well-pleaded facts [must] permit the court to infer more than the mere possibility of misconduct"); *U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 456 (4th Cir. 2013) ("[W]hen a defendant's actions, as alleged and as reasonably inferred

---

[13] The TAC alleges that the points and fees BofA earned were synonymous with its gross profit margins. In support of this allegation, Platz submitted individual loan rate sheets. At most, these rate sheets might demonstrate that BofA did not factor costs into the gross profit margins listed on its *internal, individual* loan rate sheets. The rate sheets are insufficient to support an inference that the *aggregate* gross profit margin data presented in the TAC did not include costs, given the standard, widely accepted definition for the term. *See* Oxford Dictionary of Finance and Banking 204 (4th Ed. 2008) (defining "gross profit (gross margin)" as "total sales revenue . . . less cost of sales").

from the allegations, *could* have led, but *need not necessarily* have led, to the submission of false claims, a relator must allege with particularity that specific false claims were presented to the government for payment.").

Thus, the TAC has failed to plausibly allege that BofA falsely certified compliance with a regulation or broke a material promise relied upon by the GSEs when it sold refinanced mortgages to the GSEs.

### D.  Platz's Guarantee Theory Fails to Allege the Violation of a Particular Provision

Finally, the TAC alleges that BofA submitted false claims by requesting guarantee payments on defaulted loans that had not been refinanced under HARP.  More specifically, the TAC alleges that these borrowers, who chose not to refinance, were deprived of "a legitimate opportunity to refinance through the HARP 2.0 program" because BofA's alleged LLPA overlays made refinancing too expensive, and that failure to provide this "legitimate opportunity" violated the GSEs' Selling Guides.  (*Id.* at ¶¶ 101-103; *see id.* at ¶¶ 116e, 123.)

Again, to establish FCA liability under a false certification theory, a relator must show that the defendant "falsely certifie[d] compliance with *a particular* statute, regulation, or contractual term, where compliance is a prerequisite to payment." *Mikes*, 274 F.3d at 698 (emphasis added). Even if this Court were to accept that BofA had an obligation to pass on LLPAs in loans that it actually refinanced under HARP 2.0, the TAC has failed to specify any particular provision requiring BofA to provide "legitimate opportunities" to refinance.  In fact, lenders had no obligation to participate in HARP at all.  FHFA News Release, *FHFA Fannie Mae and Freddie Mac Announce HARP Changes to Reach More Borrowers*, Oct. 24, 2011 (stating that "industry participation in HARP is not mandatory" (cited in TAC at ¶ 34)).  Thus, the claims for payment which were triggered by defaults on non-refinanced loans were not rendered false or fraudulent by

22

BofA's purported failure to provide "legitimate opportunities" to refinance, since BofA had no obligation to provide an opportunity to refinance in the first place, let alone a "legitimate" one.[14] Accordingly, this theory of liability is also dismissed.

## V.    Failure to Plead a Retaliation Claim

The TAC also alleges that BofA retaliated against Platz for pursuing conduct protected by the FCA. Under the so-called "whistleblower" provision of the FCA, 31 U.S.C. § 3730(h):

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiating of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

To properly state a claim under Rule 8,[15] Fed. R. Civ. P., a plaintiff must plead facts showing that "(1) the employee engaged in conduct protected under the FCA; (2) the employer knew that the employee . . . engaged in such conduct; and (3) the employer discharged, discriminated against or otherwise retaliated against the employee because of the protected conduct."[16] *McAllan v. Von Essen*, 517 F. Supp. 2d 672, 685 (S.D.N.Y. 2007) (internal quotation

---

[14] This theory of liability also fails to meet its pleading burden because it is too speculative to plausibly state a claim for relief. *See Iqbal*, 556 U.S. at 678 (claims showing only that liability is possible fail to meet pleading burden). Specifically, the allegation assumes that all of these borrowers would have qualified for a HARP 2.0 loan, applied, and would not have defaulted even if they had refinanced. *See U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 456 (4th Cir. 2013) ("[W]hen a defendant's actions, as alleged and as reasonably inferred from the allegations, could have led, but need not necessarily have led, to the submission of false claims, a relator must allege with particularity that specific false claims were presented to the government for payment.").

[15] Retaliation claims are not subject to Rule 9(b)'s heightened pleading requirement because the claim does not sound in fraud.

[16] Although the TAC's FCA claims are due to be dismissed for failing to state a claim for relief, these dismissals do not doom his retaliation claim because the obtainment of relief on an underlying FCA allegation is not a prerequisite for obtaining relief on a related retaliation claim. *See* 31 U.S.C. § 3730(h)(1) (creating a cause of action for retaliatory workplace discrimination against whistleblowers); *see also Hayes*

23

marks and citation omitted). A plaintiff can successfully plead the third element by showing that he was constructively discharged by his employer. "[A]n employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Terry v. Ashcroft*, 336 F.3d 128, 151-52 (2d Cir. 2003). "[C]onditions are intolerable when, viewed as a whole, they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Id.* at 152 (internal citation and quotation marks omitted).

Assuming without deciding that Platz has adequately alleged facts to support the first two elements of his retaliation claim, he has not adequately alleged facts to support the third. Platz contends that he was constructively discharged from his position as a BofA loan originator because his supervisor allegedly treated him "coldly," threatened to take away his assistant, and denied him a "bonus for the year 2012." (*Id.* at ¶¶ 110-11, 113.) Such allegations are insufficient to conclude that the work atmosphere was rendered so intolerable that a reasonable person would have felt compelled to resign. *See Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1216 (10th Cir. 2010) (finding that employee who received "cold shoulder" from supervisors had not adequately pleaded actionable retaliation); *Petrosino v. Bell Atl.*, 385 F.3d 210, 231 (2d Cir. 2004) (no constructive discharge where "employee is dissatisfied . . . with the failure to receive . . . a bonus after having received one in previous years"); *U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 716 (7th Cir. 2014) ("Supervisors' hostility towards an employee's complaints is not enough" to show constructive discharge); *cf. Benison v. Ross*, 765 F.3d 649, 660 n.2 (6th Cir.

---

*v. Dep't of Educ. of City of New York*, 20 F. Supp. 3d 438, 443 (S.D.N.Y. 2014) ("There is no question that if Plaintiff has properly pleaded a claim for retaliation, [Plaintiff] is permitted to do so irrespective of the fate of [the] FCA qui tam claim.").

2014) (employer's "threat that he would vote . . . down . . . future promotion" did not amount to constructive discharge).

Platz cites a single, unpublished case from another jurisdiction, *Ingle v. Janick*, No. 2:14-cv-544, 2014 WL 6469412 (M.D. Fla. Nov. 17, 2014), to support his argument that he has pleaded facts sufficient to state a claim for constructive discharge. In that case, the court concluded that the plaintiff had adequately pleaded constructive discharge by alleging that her work environment was so hostile that it "caused her to suffer serious medical and emotional complications which caused her to take sick leave from work." *Ingle*, 2014 WL 6469412 at *1, 5. Platz has not alleged that his work environment was so hostile that he suffered medical or emotional issues. *Ingle*, therefore, is inapposite.

Because Platz has not sufficiently alleged that his workplace was so intolerable that any reasonable person would have felt compelled to resign, he has failed to state a claim for retaliation under 31 U.S.C. § 3730(h). Accordingly, this claim is dismissed, as well.

## VI.    Conclusion

The Defendants' motion to dismiss the Third Amended Complaint is GRANTED. The Clerk of the Court is directed to close the motion docketed as ECF No. 54. The Clerk of Court is also directed to close the above-captioned action.

Dated: March 31, 2016
          New York, New York

SO ORDERED:

*George B. Daniels*

GEORGE B. DANIELS
United States District Judge

25